We'll hear argument first this morning in Case 10-507, Pacific Operators Offshore v. Valladolid. Mr. Clement. Mr. Chief Justice, and may it please the Court, the straightforward question in this case is whether the Outer Continental Shelf Lands Act provides a remedy for a worker injured in a forklift mishap on dry land. The answer is no. A worker injured on dry land from operations on dry land has a remedy in the State Workers' Compensation Law, but not from OXLA's extension of the Longshore Act to the Outer Continental Shelf. Indeed, both the Benefits Review Board and the Ninth Circuit here held that the accident occurred too far inland for direct coverage under the Longshore Act. When you say on land, do you — where do you put the 3-mile State offshore limit? Does that count as land in your view? No, it wouldn't count as land, Mr. Chief Justice, if there were platforms on there that were themselves treated as land. That might be. I think most of the 3 miles from shore is going to be the navigable waters, and that might be covered, for example, directly under the Longshore Act. But as I say, one of the anomalies here is there was a direct Longshore Act claim in this case, and the determination was that the facility here was too far inland for direct coverage under the Longshore Act. So therefore, the counterintuitive proposition on the other side of the table today is that in extending the Longshore Act to the Outer Continental Shelf, Congress effectively created a boomerang effect that caused the Longshore Act to apply further inland than it otherwise would. Kagan. Mr. Clement, just to follow up on the Chief Justice's question, if there's a helicopter crash in the water, let's say it occurs 2.5 miles from the shore, is that covered? And similarly, would it be covered if it occurred 3.5 miles from the shore? Well, Justice Kagan, I think the best answer is both of those crashes would be covered directly by the Longshore Act, because the Longshore Act by its own terms, not extended by OTSLA, covers the navigable waters. And both of those would be accidents occurring in the navigable waters. And in the part of this Court's opinion in the Pacific Operators case addressing the DOSA claim, this Court said that a helicopter effectively, when it's performing this kind of ferrying function, is a vessel. So I would think that the right answer there is not that OTSLA extends the Longshore Act, but the Longshore Act applies directly under those circumstances. The curious thing about this case is that the statutory language seems to me to speak quite clearly to some theory of causation. Any injury occurring as the result of operations conducted on the Outer Continental Shelf, that's causation. Maybe it's but-for, maybe it's proximate, but it's some species of causation. And yet nobody wants this really to be, neither you nor your adversary nor the government wants this to be based on causation. Everyone wants to smuggle something else into this. Well, Justice Alito, let me talk first about the causation and then about the smuggling, if I can. As to the causation, I think there is both causation in this 1333b and a citus requirement that both sides acknowledge. At a bare minimum, there have to be injuries resulting from operations conducted on the shelf. And I think that alone, that causation principle alone, if faithfully applied, is enough to decide this case in our favor. But let me address the smuggling, because I do think that there is an injury that occurs on the shelf that is not a consequence of operations conducted. Aren't just beachcombers out there, or what? Well, I think the best example would be, Your Honor, is somebody who's on the shelf, but they're not employed in the relevant production purposes. And so you might have an accountant. What are they doing out there? Well, you might have an accountant out there. You might just have some employees who are out there whale-watching or something. How many accountants go to platforms? Well, Justice Ginsburg, I think it's worth recognizing. I mean, I don't know how many go. I doubt very many go. But Congress passed this statute at a time where they didn't know the full scope of the operations that would take place out on the shelf. And so what they're trying to do is they're trying to, at the one point, they're trying to limit it to employees who are engaged in the operations out there that are designed for the production of the mineral wealth of the shelf. And so I think that's what some of the language is corrected at. But if that's what Congress meant, then the emphasis should be on is this person one who regularly works on the Outer Continental Shelf? This worker, we're told, was on the Outer Continental Shelf 98 percent of the time. Sure. And if he was on the Outer Continental Shelf at the time of this accident, he probably wouldn't have been injured. But the one thing I think the statute clearly speaks to is not status, but it speaks to, as Justice Alito suggested, at a minimum, a relationship between the operations that caused the injury and the fact that those operations have to be conducted on the shelf. Kennedy. But if you had said status or situs, then it seems to me it would have made more sense, given the language of the statute. We all have hypotheticals. We don't have too many. But it's quite common on oil rigs that the employees bring some of the equipment back to the land, clean it, repair it, and so that they can bring it back to the next tower, the next shift on the rig. And some of this machinery is complicated. It has springs. And suppose that the worker brings the machine back from the rig to the land, to the base of operations, its land base, and is injured in repairing that machine. Under your view, no coverage. No coverage, Your Honor. And I think that's quite difficult to square with the as-a-result language. Because this is a result of the operation. Let's just say the machine got broken because of the operations and he's fixing it and he's injured. No, I disagree, Your Honor, respectfully, and I think your way of looking at that hypothetical doesn't give sufficient import to the phrase, conducted on the shelves. It's what Respondents want to do, is they want you to look at the statute as saying as long as there's an injury that results from operations that have the purpose of developing the Outer Continental Shelf, that that's enough. And if that were enough, I think the answer to your hypothetical would be that's covered. But the statute very specifically says that they have to be injuries as a result of operations conducted on the shelf for the purpose of extracting the mineral wealth of the shelf. And so that first, on the shelf, I think clearly modifies the operations. Only operations conducted on the shelf are covered by the statute. Kennedy, The government and the Ninth Circuit take care of that by saying the person has to have, the injured employee has to have spent a substantial amount of time on the offshore operation. So you could add that. Well, you can't add that, Your Honor, because if there's one thing that is absolutely clear about this statute is that it doesn't include a status test that looks for the And that's not I thought your brief, your reply brief said you, you superimpose a status test. You have the situs of the injury and then you superimpose status. So your test is not simple state of, a place of injury. Yeah, I agree. I thought you had a backup argument in your, in your reply brief. Sure. I mean, I have two arguments, and let me try to address both, which is on the causation point. If you look at just causation and you don't have a situs and a status requirement, then in that scenario, you, there's no way to get just a status test. And the only thing I would implore you to think about in that is not only is it not in the statute, but there is a statute that has a status-based remedy that travels with the worker wherever they go. It's the Jones Act. And it specifically is written in status term. And that was a model that Congress had before it, but it specifically rejected the admiralty model for dealing with these structures and adopted the model that has some features in the end. Well, do you call status, if the test is where you spend a substantial amount of time working, is that what you call status? That's their status test, exactly. But you call that status? I call that their pure status test, which they themselves cite to Chandris, which is a Jones Act case. That just doesn't work. This was not the Jones Act. Now, there is a test where we say that the best reading of the statute is status plus citus. And if I could try to get this argument out, it's a little bit complicated, because I think the defect of this argument, if it has one, is it doesn't leap out directly from 1333b, and you have to read 1333b in conjunction with both the rest of 1333 and in conjunction with 903a of the Longshore Workers Act. If you do that, I think you will see there is a citus requirement and a status requirement. Let me start with the rest of 1333. If you think about this statute, the primary engine for applying Federal law to the shelf is not 1333b, it's 1333a. It applies all of Federal law to the shelf. But some statutes it doesn't work, and the Longshore Act is one of them. If you apply the Longshore Act to the shelf without any modifications, it won't cover the shelf, because it's by its terms has a citus requirement that's limited to the navigable waters and at that point the dry docks. So Congress has to tailor the Longshore remedy to the reality of the shelf, and it does it in two ways. One, it has this language that everyone is focused on that is something of a status requirement and that limits the recovery to employees who are engaged in certain activities. But the rest of the language in 1333b is important. It's these definitions, 1, 2, and 3, and they effectively define terms in the Longshore Act to make them work for purposes of extending it to the shelf. And the key definition is 3. 3 defines the term United States when used in a geographical sense, and it defines it to include the shelf, the artificial islands, and the fixed attachments thereto. Now, that's a puzzle if you look at 1333b in isolation, because it's defining the term United States for geographical purposes, and 1333b does not use the term United States for geographical purposes. But another statute does.  It's the longshore remedy that's extended. And 903A uses the term United States. And 903A, if you want to look at it, is at page 96 of the Petition Appendix. But that's the CITES requirement. The CITES requirement of 903A, unmodified, limits recovery to the navigable waters and dry docks. So if you take that definition from b)(3 and essentially superimpose it on 903A, you then get a remedy that has a CITES requirement. There's a recovery, but only if the injury occurs on the navigable waters, dry docks, the shelf, artificial islands, and the attachments thereto. So it's, as I said, it's a complicated argument, and it doesn't stare you in the face if you look at 1333b. Sotomayor, how does that provide you CITES on the adjacent orders? Well, I don't — with respect, Justice Sotomayor, I think you get that without Oxlow, which is to say I think that there's a remedy under the Longshore Act directly under the adjacent waters, because the adjacent waters are navigable waters. I see. So you're saying you don't even — you're not going to. You don't need those. And that just underscores that Congress in this statute is really dealing with a very particular problem with the shelf and the artificial islands and platforms attached to them. So how do you get to the water above the shelf? Same way, Your Honor, which is to say they're navigable waters. Instead of saying they're part of the shelf. Exactly. And they're not. And the statute, I think, couldn't be clearer about that, because 1332. I think the issue that Justice Kennedy was alluding to was the example the Ninth Circuit used. A pitcher on the mound throws a baseball and hits the batter. The CITES is not the mound, but the injury has occurred as a result of pitching. And so he's coming up with examples, and I think that's what the Ninth Circuit was saying when it was creating the test of the substantial nexus between the operation and the injury. And that's the part of your definition that gives no credence to that possibility. And I may be arguing that as a factual matter. What this man was doing on land was not a substantial nexus. That's a different issue than providing a test that limits injury to an operation solely on the shelf. And if I could take that, there's a couple of pieces to that, Justice Sotomayor. First of all, I would say that I think that the hypothetical, let's say, of, you know, a nut or something coming off the shelf and hitting somebody somewhere else, is — illustrates the difference between our primary argument and our backup argument. On our primary argument, somebody — if the nut hit somebody in the navigable waters, they wouldn't recover from OXA. They would recover under the Longshore Act directly because they were on the navigable waters. On our backup theory, that it's a tight proximate cause test, then I would say, yeah, that person can recover under OXLA, but that's really a fortuitous set of circumstances, precisely because I wouldn't apply a substantial nexus test, which seems to me just an invitation to kind of play around with — Sotomayor, you're not — you don't want a but-for test, or do you? Certainly not. All right? You don't want a proximate cause test. Well, I could live with a proximate cause test as long as it's a proximate cause test that's tailored to this statute. And what I mean by that is I think if you look at this statute, you can't have a proximate cause test that doesn't take geography into account. And I think in particular, I think in a case like this, you have to ask yourself not just proximate cause in the abstract, but were there operations somewhere other than the shelf that were a more direct proximate cause of the injury? And if that's the case, then the remedy lies in the law that applies to those other operations. Sotomayor, do you have a definition of causation now? What's that? This is a new version of proximate cause, so. Well, you know, it's funny because, you know, this Court has on more than one occasion sort of remarked that proximate cause itself is a weird formulation because proximate sounds like it has a location aspect to it. And we actually think for purposes of this statute, that should be right. It's proximate cause that's tailored to this statute and the policies of this statute, and I think that would want to really take the geography into account. Scalia, I don't really understand proximate cause as applied to a statute that provides for automatic liability rather than liability for negligence. To say that it's a proximate cause of a particular act of negligence is one thing, and we have a whole body of law that gives guidance for that. But do you know of any other situation where we talk of proximate cause, something proximately caused by operations, not by a particular act of negligence? Or I don't know how to apply proximate cause to an operation. Well, Justice Scalia, I would say two things. One is, I do think there's an anomaly here, but I do think it's, you know, you're not being asked to apply proximate cause for purposes of assessing liability. Because as you say, strict liability, it's kind of automatic liability. But what I would say is you are being asked, at least under the backup theory, to apply proximate cause as a way of determining the geographical scope of the statute. And that's anomalous, but I don't think it's so anomalous that you wouldn't do it if you thought that was the better way to read the statute. That said, I do think that the best way to read the statute is consistent with all the other statutes as part of a jurisdictional puzzle. I mean, all of the areas off of the shelf are governed, with the exception of Seaman under the Jones Act, primarily as a matter of geography. Ginsburg. Mr. Clement, if your position is right, then we have a worker who, most of the time, is doing work on a platform, and he will be covered or not, depending on whether the injury occurred on the shelf or on the land. So it's the other view is to say what this person does most of the time is what counts. Then this worker would always be covered by OXLA, and if you take your view, then one will be covered by OXLA, another one who's doing the same job is covered by a State. A State. You have a variety of State workers' compensation laws, as opposed to a uniform law governing workers of this kind. Well, two responses, Justice Ginsburg. First of all, this Court has already confronted the objection that, well, if under OXLA, workers would move in and out of coverage, and it rejected it in the Herbst Welding case. And I don't think it's common ground, well, maybe not, but it should be common ground, that if you had a worker who was injured on a State platform, that that would not be covered by a State waters platform, that that would not be covered by OXLA. And again, that was an anomaly that this Court confronted in Herbst Welding, and the Court said, yeah, well, you know, workers are going to move in and out of coverage, but that's what OXLA says. That's what OXLA does. Kennedy, I'm looking at Petition Appendix 96903A that you referred us to. I wasn't quite sure of your argument with respect to this statute. This statute is a CITUS-based statute. Yes, and it's the Longshore Act. But since Congress didn't follow this model in the – in subsection B that we're looking for and used as a result, why doesn't that show that Congress meant something different? I didn't hear your argument on that point. Well, my argument is that's not true. I don't see, in other words, how 903 doesn't hurt you more than it helps you. It helps me because 1333B doesn't apply a different model. It adopts this model. It adopts and extends the Longshoremen Act to the shelf. See, it's a mistake to read 1333B. But it doesn't. It talks about where the injury occurs. And that's not what – and that's not what B says. No, it talks about that as part of extending the Longshore Workers Act to the shelf. It's important that, you know, you can't get – I mean, 1333B, like I said, is not a self-contained offshore workers' – workers' compensation regime. What it does is it extends the Longshore Workers Act to the shelf, including 903A. But what I'm saying is Congress recognized that you couldn't just extend 903A and the rest of the Act to the shelf without modification, because then you'd come to this language that says you only get relief if your injury occurred on the navigable waters or the dry docks attached there, too. So Congress in B-3 changes the definition of the United States for geographical purposes in a way that allows you to superimpose this provision to the shelf, but instead of reading it to say you only get a recovery if you're injured on the navigable waters, including the dry docks, you get a recovery if you're injured on the navigable waters, including the shelf, the dry docks, the artificial islands, and the fixtures attached there, too. But it's – Ginsburg. Mr. Clement, may I go back to you? You referred to Herb's Welding, but that was a case – it was a claim under the Longshore Act, not an OSCLA claim, and the Court said it was expressing no opinion on whether 1332B covered the injury. That's right. Herb's Welding is not a holding, but at the end of that opinion, the Court confronts this argument that isn't it odd that somebody would be moving in and out of coverage, and the Court says that that is a product of OCSLA. And it doesn't say it's a product of OCSLA generally. It says particularly that it's a product of OCSLA's extension of the Longshore Act. And I do think that this objection about people moving in and out was answered by the Court in Herb's Welding. I would also say, Justice Ginsburg, the second point I wanted to make in response to your earlier question is, I understand that it might make policy sense to have coverage that encapsulates an individual no matter where they work. But the problem is, I mean, that's not only a different model. That's the model that Congress rejected. They thought long and hard about having an Admiralty remedy, and presumably then the Jones Act would apply, and if you were attached to a vessel or a platform, then you would have coverage no matter where you went. But that's not what they did. They incorporated instead as their model the Longshore Act. And the Longshore Act always had a CITUS requirement. So when Congress makes a conscious effort to deal with this unusual geographical problem with and solves the problem with the Longshore Act, which is sitting there with a CITUS requirement and doesn't adopt the Jones Act, which has a status-only requirement, it seems very, very peculiar to adopt instead a model that would have a status-only model. Ginsburg. But Congress also did not adopt the proposal, the specific proposal, to confine OXLA to situations in which State workers' compensation was unavailable. And I think that's why they rejected that with good reason, Your Honor, because you have to remember that at this point they're living with the experience that this Longshore Act, which at that point did carve out and limit the Federal remedy only when a State remedy was unavailable. And they were watching that play out, and it was a mess. People didn't know if they should bring a State case or a Federal case. And at that point they were viewed as exclusive. So Congress had ample reasons to reject the idea that we're going to only give a Federal remedy if a State remedy is unavailable. Scalia. What reason did they have to use the terminology, as a result of, instead of simply saying that this Act applies only with regard to injuries on the platform? Which is what other statutes did say. I mean, other statutes had a geographical requirement. What a strange way to say it, as a result of operations. Justice Scalia, I don't know which other statutes you're talking about. I mean, the other statute that most plainly has a CITES requirement is the Longshore Act, and that's precisely what they extended to the shelf, as I've argued. Beyond that, it's true that some of the other provisions of this Act have slightly different wording, but I don't think anything turns on that. Kagan. But, Mr. Clement, you are asking us to just ignore six words in this statute, right? You read the statute as any injury occurring on the outer continental shelf, when, in fact, the statute says any injury occurring as the result of operations conducted on the outer continental shelf. And you give a variety of arguments in your brief about what those six words are supposed to do. They're supposed to cover latent injuries. They're supposed to make sure that the statute only covers things that happen in the scope of your employment. But your friends come back and say the statute did all those things anyway. These six words would serve no function under your theory. Justice Kagan, first of all, it's interesting. The only way they can say that those functions were performed by the statute anyways is to incorporate provisions of the Longshore Act, because 1333b itself doesn't take care of latent injuries or doesn't take care of, you know, who's in the scope of their employment. All of that is taking care of the Longshore Act, which is why I think the best way to read this is incorporating the Longshore Act and its CITUS requirement. But beyond that, I would never ask you to make six words go away. Never. Those words do play a function, but the function they play is to make it clear that the injury has to result of operations conducted on the shelf for certain purposes. And that precludes an employee, accountant, who's out on the shelf and injured by something that has nothing to do with shelf operations. But this goes back to Justice Ginsburg's question. She asked you how many accountants are there on the shelf. One can't really imagine that Congress is writing this statute and drafting those six words in order to make sure that an accountant who goes out to the Outer Continental Shelf isn't covered. Justice Kagan, I would beg to differ. And I think what you have to understand is go back in 1953. And when they're — I mean, you can say confidently that there aren't accountants on the shelf because you have the benefit of 60 years of experience with — post-1953 with what goes on in the shelf. Congress at this point is sort of legislating for a brave new world, and they don't — they're trying to provide for all of the occasions that may come to pass out on the shelf. There is a great law review article that actually provides this background, and it's written by, of all people, Warren Christopher, the Warren Christopher. And it's in the Stanford Law Review, and it was written December of 1953. And it's worth a look, because it captures this idea that they're kind of, you know, legislating for this brave new world out there. And they don't know who's going to be out there. They don't know if it's going to be all drill workers or if there's going to be accountants and clerical workers out there. And so I think with that context, it's not at all odd that they would use those six words to say kind of the way that Congress did later in 1972 in imposing the Marine Employment Test for longshoremen. It's like, look, we want to provide a longshore remedy, but not to just anybody, any employee who might happen to be on the shelf. We want to provide it to those people who are essentially in the core operations that are going on on the shelf. If I could reserve the balance of my time. Roberts. Thank you, Mr. Clement. Mr. Palmore. Thank you, Mr. Chief Justice, and may it please the Court. I'd like to start off with the exchange that Justice Kagan had with Mr. Clement about the language that was used here in 1333b. And I think the contrast between the language that Congress used in 1333b and the language it used in other provisions, neighboring provisions of 1333, is instructive. I'd like to point the Court to section 1333c, which is on page 3a of the appendix to the government's brief. This is the provision involving the National Labor Relations Act. And I think this shows how Congress went about drafting when it wanted to specify legal consequences that would flow from an actual event that took place in a particular place. So Congress extends the National Labor Relations Act to any unfair labor practice, as defined in such act, occurring upon any artificial island, and it lists with particularity the particular situses where the National Labor Relations Act would apply. If Congress had followed that model in section 1333b, it would be a very different statute. It would have said, as Your Honor pointed out, with respect to disability or death of an employee resulting from any injury on the outer continental shelf. If Congress wanted to additionally have some kind of operations nexus, it could have said occurring on the outer continental shelf as the result of operations on the outer continental shelf. Congress didn't do either of those things in section 1333b, and we think that contrast is quite instructive here. It's also not the case in section 1333b. Sotomayor, but it's a little different when you're talking about a labor practice and an activity that results in an injury. Labor practice, by its terms, is going to have applicability to a particular location, so you would expect them to use that type of language. It doesn't carry the same negative implication you're suggesting under 1333b. Well, I think that, Mr. Chief Justice, that I think there's a contrast between 1333b and 1333c in terms of the specificity with which Congress provided for where a particular event would happen. There's no question that 1333b has a situs requirement, but it's a situs of operations requirement. So when you're talking about a situs of operations, you're talking about a geographic zone where operations take place. It makes sense that Congress would have used this phrase, on the outer continental shelf. Now, the outer continental shelf itself is a defined term in the statute. In 1331a, it applies only to the subsoil and seabed. It doesn't include artificial installations put on top. So we're talking about a general zone, a general geographic zone where the operations take place, and then Congress wanted to provide benefits for injuries that result from those operations. Suppose the facts of this case were changed a little bit so that the Respondent, instead of spending 98 percent of his time on an oil rig doing the things that he did there, actually spent only 20 percent of his time there, and he spent 80 percent of his time on land doing what he was supposed to be doing at the time of the accident. This particular operation produced so much scrap metal, he had to spend 80 percent of his time going around with a forklift, gathering it up. Now, would this case come out the same way, then? We don't think so, Your Honor. Then how does that – I don't see how you get that result out of the statutory language, because the causal connection between the operations on the shelf and the accident are precisely the same in the two situations. Whether he spends 98 percent of his time on the rig or 2 percent of his time on the rig, it makes no difference whatsoever in the causal relationship. Because we think it's a mistake in the context of a workers' compensation scheme to look at this as kind of a snapshot in time. We think that when you're talking about a workers' compensation scheme, the kind of causation that is relevant is the causation caused by the employment relationship itself. So if someone's spending, like Mr. Valliardoli, is spending 98 percent of his time on the shelf, he's uniquely exposed to the hazards of work in that dangerous environment. Scalia. The trouble with that is that's not what it says. It says, as a result of operations. And I don't – you know, I would think he doesn't even have to be an employee, does he? He does have to be an employee. That's a – only employees are entitled to benefits. But I think the definition of employee, or really the related definition of employer, is instructive on this question. If you look at the definition of an employer in 1333b-2, this is on page 3a of the  They gender all the other positions of importance for the government appendix. Says the term employer, means an employer, any of whose employees are employed in such operations. It's somewhat of a circular definition, but there's a focus here on employees who are engaged in such operations. Those are employees like me. Kagan. Kagan. And you're asking us to look at the relationship between the employment and the shelf activities, and the statute asks us to look at the relationship between the injury and the shelf activities. And those may be two different things, and seemingly are two different things in the hypothetical that Justice Alito gave you. And the Ninth Circuit viewed injury in the way that Your Honor and Justice Alito are suggesting. And I would say, and that's our backup position. I think both sides here have backup positions. I would submit that the backup positions are really Backup positions may be better than the primary positions in this case, you know? I think the backup positions are really also differ with each other only in a matter of degree, not in time. What is the backup position that's so much better here? What is it? Well, I don't – to be clear, we don't think it's better. We think that the category of off-shelf injuries that should be covered are those that are suffered by workers who spend a substantial amount of time on the shelf. The backup position is the, in our view, is the Ninth Circuit position, which is the substantial connection between the injury and operations on the shelf. It doesn't strike me as that different from Mr. Clement's backup position. Well, the trouble is that I have no idea what that means. Now, they have the example of an accountant on land who spends all of his time doing accounting work for the oil rig. Why isn't there a substantial connection there? Were it not for the operations on the oil rig, this guy would be out of work or he'd be doing something completely different. I don't understand that. Well, that's the – that would be the – an expansive but-for test of the kind that at least some language in the Third Circuit's opinion in Curtis would support. We think that that sweeps too broadly. We think approximate cause, however, sweeps too narrowly. And Justice Scalia's exchange with Mr. Clement highlighted this. Approximate cause is a – Substantial nexus is just right? We think it's a substantial – substantial nexus, substantial connection. We think, though, that it would be a mistake to look at only the snapshot in time, and there's some language in the Ninth Circuit decision which might suggest that. Sotomayor, do you accept your adversary's position that whatever causal – you have to, given your status test. Where are you drawing your status test from? Meaning, obviously, it's not from the language. Well, I think I would submit that it is from the language, Justice Sotomayor, because we think that the language has to be understood in the context of workers' compensation. This is not a tort-based fault regime. This is a workers' compensation scheme. Workers' compensation schemes are based on the relationship between employer and employee, and they cover injuries that arise out of and in the course of employment. So the kind of causation that matters in a workers' compensation scheme is the causation that flows from the worker relationship itself, the workplace relationship itself. You're not – I would have just thought you would have taken it out of B, subdivision 2, the term employer, almost the opposite, means an employer – means an employer any of whose employees are employed in such operations. Thank you, Justice Sotomayor. I think that's the second point. I think that textual provision provides support for the fact that Congress was particularly focused on those employees who were uniquely exposed to the hazards of work on the shelf. But what if that exposure is not pertinent to what they're doing? Let's take the same individual, 98 percent of the time on the rig and 2 percent on land, and an emergency comes up, they need a new part, and they say, here, go, you know, go drive to Reno where they have a new part and bring it back. And he skids off the road and is injured. Is he really covered by the Offshore Act? We think he is, because that is a worker who is uniquely exposed to those hazards offshore, and he shouldn't walk. So he's injured by, you know, a hazard on the road to Reno. He's – I don't know how many miles that is from the offshore, and yet he's still covered by the Offshore Act. Yes, Your Honor, because we think that the – that it's – and here the contrast with the underlying Longshore Act is important. And Justice Kennedy's questions of Justice – of Mr. Clement highlighted this, because it's quite an unusual thing for a workers' compensation statute to have a situs of injury requirement. The Longshore Act is the sole example of which I'm aware, and it has it for historical reasons based on this Court's decision in Jensen. And it has a provision that's quoted on page 19 of the government brief that provides coverage for disability or death, but only if the disability or death results from an injury occurring upon the navigable waters. That was clearly in front of Congress at the time that it adopted OXLA, because it was incorporating that statute and applying it in the Outer Continental Shelf context. And it's quite telling that Congress did not use that but-only-if formulation. But Mr. Clement says that, and we can argue about whether the language does it or not, but the system he comes up with, he says, creates a very sensible division. You're either under the Longshore Act or you're under this Act, and whereas in your situation, you can be under both, can't you? Yes, in some situations. Well, why does that make any sense? Because the kind of certainty we think our test is actually much easier to administer and provides greater predictability in this sense. Which one prevails when they both apply? Are there any differences between the two? Well, there's a – Congress contemplated, expressly contemplated that there would be overlapping coverage, and adopted a provision in 903e of the Longshore Act to provide for offsetting payments when there is overlap. So overlap is a fact of life in this area. The question is, is there any difference between the two? Well, in this case, the Federal benefits were more generous than the State benefits. Why wouldn't they have been? I mean, as I understand it, if a person of a certain set, and it's the same set in both, virtually, the same set of people, where they are injured on navigable waters or piers and docks and so forth, it's the Longshore Act. And if they are on the platform, it's this Act so far, and the benefits are the same. Correct. Okay. So the only thing that extending this does, I think he says, is imagine a person who worked on a platform goes to get some platform bits repaired miles from the sea. Now, that person would not be covered by Longshore Act, would he? Would not, no. And he would be covered by this if they are right, but not if Clement is right. Correct. Okay. So he's saying, what point was there for Congress to do that? Because we thought that Congress intended this to function in the way that other workers' compensation schemes function, both at the time that OXL was adopted and today, which is that the coverage provides comprehensive benefits from the start of the workday and the end of the workday. Let me give you an example that might help. A longshoreman is working on a dock. Someone tells him there is a winch here that's broken. Take it to the plant to have it repaired, which is 100 miles inland. He does it, and he's hurt at the plant. He is not covered. Under the Longshore Act? Correct. Yes. Yes, that's right. So he's not covered. Correct. But if the same thing happens on the platform, under your theory, he is covered. Now, your opponent is asking a reasonable question that seems to be about the only difference that he can think of, whether it's the one act or the other, and why would Congress have done that? That's his question, and I'd like to hear the answer. Because in that situation, Justice Breyer, the Longshore Act's strict situs of injury requirement is the exception, not the rule. That is unusual and really unprecedented in imposing a situs of injury requirement in the context of a workers' compensation scheme. At the time of Oxla, the time of Oxla was adopted in 1953. States had nearly uniformly moved away from the tort theory of workers' compensation coverage that would apply. So your answer is basically there are many statutes like this. They all have some kind of Oxla-type requirement. It's the Longshore Act that was rather stingy, and we don't know why. No, we do know why. It was stingy for historical reasons. Because of the workman's compensation. It was based on this Court's decision in Jensen, and there's a whole long and tortured history there, and that explains why Congress did that. But when Congress took the unusual step of imposing a situs of injury requirement in the context of a workers' compensation scheme, it did so in express terms with this only if phrase. Sotomayor would the worker who went to the factory be covered by State workman's comp? Yes. Just like the worker on a fixed platform on the Outer Continental Shelf would also be covered by State workers' comp. Private Respondent cites the Bobbitt case from California that says California workers' comp doesn't have a location requirement. I'm sorry, I don't understand the answer. So he's covered by both? Yes. Overlap, a certain degree of overlap is a fact of life in this area. Section 903e accounts for that by allowing for offsetting payments. So there's never going to be double recovery. And 903e really just endorsed a historical practice of offsetting payments that was discussed by this Court in the Calbeck case. So that there has always been some degree of overlapping coverage. At the time of Oxl was adopted in 1953, this Court in Davis had recognized that even under the Longshore Act itself, there was a twilight zone of overlapping coverage. So when you're covered by both the Longshore Act and State workman's comp, can you proceed under either one? You might be able to proceed under either one if you're covered under either one. But what is quite clear, Justice Scalia, is if you can't collect under either one or if you do, there are going to be differences in the offset. But you think you can proceed under the State law if you choose? Yes, Your Honor. Do we owe the courts give some deference to the director's position? May I answer, Justice? Yes. In this Court's decision in Rambo, the Court said that the director's interpretation of the statute is entitled to skid more deference. Thank you, counsel. Mr. Frederick. Thank you, Mr. Chief Justice, and may it please the Court. I'd like to shift some focus to what would have happened if Mr. Vitalit had worked on a floating platform instead of a fixed? Because the law is clear that if the platform was floating, he would be a Jones Act seaman, and under this Court's cases, if he were injured on land, he would have a Jones Act remedy. So the only anomaly here is that he happened to be working on a fixed platform 98 percent of the time, and the question is whether the permissive workers' compensation benefits provided under OXLA carry with him when he happens to be injured on land as a result of the shelf operations. I don't think that's an anomaly. I mean, you know, if it's a floating platform, it's a vessel. The difference between a vessel and a dock. Is it an anomaly that you're covered under the Longshore Act if you're injured on a dock, which is fixed, but you're not you're covered under the Jones Act instead if you're on a vessel, which is not fixed? It seems to me like an anomaly. Well, let me answer your question, Justice Scalia. How many floating platforms are there, anyway? There are a number of floating platforms in the Gulf of Mexico that are operating on the intercontinental shelf as well as on the major Pacific coast. And they're covered by the Jones Act? Yes, that's correct. There should be, they're vessels. But the point is that they get a Jones Act remedy if they happen to be injured on land. So just, Mr. Chief Justice Senator, you're hypothetical if the Jones Act seaman is driving to Reno and there's an accident, he's covered under the Jones Act and gets to have a Jones Act remedy, notwithstanding that the injury has nothing to do with his service on the vessel itself. You're not proposing to eliminate that anomaly? No. What I'm saying is that You're saying wherever you're injured, so long as you're on a platform, you're covered? I don't think so. If the work is substantially related and the causal connection goes to the employment relationship to the operations, the worker is covered under Oxley.  Sometimes it will be covered, sometimes it won't be covered. It is, to be sure, a more comfortable fit to the actual language of the statute than imposing and superimposing a situs of injury requirement, which is nowhere to be found in Section 1333. Is there any injury on land in the course of employment that would not be covered by Oxley, where we have a worker of this kind who spends 98 percent of his time on the Outer Continental Shelf? The injury, however, is on land. Is there any case where such a worker dominantly works on the Outer Continental Shelf would not be covered by Oxley, in your view? Well, if the work is arising out of the course and scope of employment, which is the natural way that these workers' compensation regimes work, and it is related to the shelf operations, our submission is, yes, he is covered under Oxley. So then what you're really saying is it's not your test, but really the government's test, saying we look to see, is this person dominantly working on the Outer Continental Shelf? That's correct, Justice Ginsburg. It's the easiest to administer test, too, because the way workers' compensation insurance works, the employer will, based on the payroll of the workers who are out on the shelf and its overall payroll, will pay workers' compensation premiums. And under the Department of Labor regulations, it will add an endorsement for those workers whose status it controls would be covered under Oxley and thereby get the higher compensations. So if you work only 20 percent of your time for this drilling company on the platform, but it so happens that you are injured on the platform, you know, a bolt comes off and strikes you, you're not covered? Well, our submission would be he would be covered because he's directly injured as a result of the operations on the shelf. It's two-factor. Scalia Then you're not applying the employment test. I mean, you either are or you aren't. Well, that person is going to be covered under our submission because it's a two-part inquiry. You look at the nature of the relationship and you look at the nature of how the injury came about. And under those circumstances, we agree with the government that if somebody is — if an employee is out on the platform and is injured as a result of operations, that person is covered. Heads, I win, tails, you lose, right? We have a CITES of the injury test when you have less than your majority of your work on the platform, but we don't have a CITES test when we have a majority on the platform. How do you get that out of the statute? It's even greater under their hypothetical with the helicopter worker, because they want to get the person who's riding in the helicopter out to the shelf covered under the Longshore Act, and yet that flies directly in the face of this Court's holding in Herb's Welding, that when he's on the fixed platform, he doesn't get longshore benefits. And so here, under their hypothetical law, the Longshore Act, I thought — I thought it was the Jones Act that they would cover the helicopter. No. Under his submission, his submission is that when they fly out in the helicopter and they crash in the water, they get longshore benefits. But if they actually made it to the platform under this Court's holding in Herb's Welding, they would not get longshore benefits if they were in State territorial waters. Both positions, Mr. Frederick, are vulnerable to particular hypotheticals. You have imprecision on what it means to spend most of your time on the — on the shelf, and they have their own problems. I mean, what do you do with somebody who's 3 months he's on the shelf and then 3 months he's back — back on land 3 months? Does it depend when the injury occurs, whether it's when he's on the land part of his job or on the shelf part? The way this Court handled that in the Seaman context under Chandras was to look at the totality of the circumstances of the worker's employment, and that seems to be the same. Well, that's — I've given you all the totality. He's working for 3 months and then he's — you know, it's seasonal or something, and 3 months he's on — on the land. That is the totality of the circumstances. He would be covered, because he is the kind of person that Congress wanted to provide coverage to under Federal work. Remind — remember, in 19— How do you know that's the kind of person? I thought your line was whether or not he spends most of his time on the shelf or most of his time somewhere else. Our test actually is substantial work. We don't disagree with the government's adoption of a Chandra's 30 percent line. That seems appropriate in light of the fact that many of these workers come on for 2 weeks or off for 2 weeks. They're working 12-hour shifts while they're out on the rig. It seems appropriate that the coverage should go with them when they head to work on the land. So 30 percent is the line? That's what the government — I have no brief to defend. Mr. Chief Justice, in terms of where that line is, because my — my client's husband — Well, I know, but we'd like to have a test that we apply to your situation. And it's nice to know maybe 30 percent, I guess, is as good as any. The point that Congress was trying to get at, and these are platforms that were covered by State workers' compensation in 1953, was to extend the more generous Federal benefits to encourage an industry that was a nascent industry to develop the resources of the Outer Continental Shelf to provide uniformity, to provide benefits to the workers who were exposed to the perils that were out on the platform. And so it makes sense, we submit, that when those workers who are — who are subjected to those circumstances have the same Federal benefits, and there are substantial benefits. My client, for instance, got a one-time lump sum payment of $42,000 for the death of her husband, as opposed to the Federal benefits that would be approximately $466 per week during the remainder of her period as a widow. And the State benefits would be credited against any Federal benefits that she would be getting in the future. But it's — it is a substantial dimension to the life of a worker out on the shelf. Kagan. So suppose, Mr. Frederick, that we find that we can't find your status test in the language of the statute, and that what the statute seems to give us is instead a causal test, and that the cause is whether operations on the Outer Continental Shelf caused the injury in question. So what's your best argument for how operations on the shelf caused the injury in this case? The scrap metal that Mr. Vidalede was charged with moving at the time of his death was very likely the same scrap metal that he personally had taken off the shelf or someone in his position would have taken off the shelf. And to Justice Kennedy's point, the equipment is heavy, dangerous, difficult equipment. Just the fact that it is moved off the shelf for a cleaning, scrap, for removal, et cetera, is an immaterial difference. And their reply brief, they concede that an oil spill worker who's cleaning up this oil spill from an offshore event is going to be covered under what they call a proximate cause standard. Under any kind of substantial connection proximate cause, proximate cause is a legal policy that determines how you want to limit the scope of the injuries that would be covered. In a workers' compensation scheme, Justice Scalia, you are completely right, it makes no sense. And so if you adopt some kind of substantial connection, it has to be very loosely related. As the Court in the FELA context last term held in CSX v. McBride, where you have a negligence standard, it makes even more sense to have a very relaxed standard of causation under workers' compensation. Scalia. I assume that the Act would also apply, under your analysis, to a — an independent contractor, a trucker, who carries this heavy — this heavy steel to the place where this worker worked on it, right? I don't think so. Well, you have to be an employee. Had it not been carrying the steel, had it not been for the operations on the shelf. It has to be an employee. If your hypothetical is the independent contractor on land, it has to be an employee in order to be covered, and that person doesn't qualify, which creates another set of difficult lines to draw under the Longshore Act, where you also have to be an employee and independent contractors are not. He would be covered if he were employed by the firm that operates the platform, right? If you could give me the rest of the facts of your hypothetical, yes, it's true. It's just the guy that drives the truck that takes the steel to the place where your client worked on it. Not covered, because that person is not directly substantially working on shelf operations. Unless he spent 30 percent of his time on the shelf. Then he's covered. Yes, because those workers, those workers, I think it's hard to imagine the kinds of things. Kennedy, is it 30 percent of his time over his career or that month or in a year? This Court's articulation of that standard, Justice Kennedy, in the Chandra's test has been the subject of litigation in the lower courts. And my understanding is that the courts have kind of worked out the various factors and standards that go into the nature of the employment standard. Ginsburg You're talking about the Chandra standard, that the seaman's relationship to the vessel must be substantial in nature and duration, and that's kind of a vague what's substantial is the same problem we have here. What is the result? That's correct. And the nature, you know, if I could, I'm sorry, did you want to say something? Yes. So how have courts worked this out? What is the substantial relation to the vessel? As I understand the case law, Justice Ginsburg, there are a range of factors that go into the nature of the sea worker's relationship to the vessel, and they go to duration, they go to the performance of duties in the completion of the mission of the vessel, and the like, and there are a range of standards. Obviously, the facts of each crew member is difficult to unpack in a hypothetical at this time. But that's a real, obviously, it's a real mishmash, and maybe that's what we're stuck with. How does this work as a practical matter? I assume the companies get insurance to cover their risks here. Correct. Who decides, I mean, the insurance company will underwrite how many people spend what percentage of time where? As a practical matter, Mr. Chief Justice, and I don't represent the insurance company here, but the way I understand that it works is that on an annual or a periodic basis, the company and the insurance company get together through some auditing process where there's verification of the workers who are OXLA workers and thereby get the longshore benefits, and the company and the insurance company work that out to determine either numbers or particular individuals or the like. And so here what we're talking about is a situation where the employer is not liable for the damage. It's an insured risk, and the insurance company is not liable for the damage.  It's an insured risk, and the insurance company is not liable for the damage. Roberts. No, we're going to have to pay higher insurance rates to say they're not liable for it, I think, is a real. It's a different form of liability, and it's one that, based on the way workers' compensation traditionally has developed, and I would direct the Court to the opening chapters of Larson's monumental treatise on workers' compensation, where he basically says that this is a social compact in which the employer doesn't have to face liability for personal injuries in tort, but gets insurance and the premiums are then passed on to the consuming public of that particular entity's goods. Breyer. Does it carry over who's an employee from the Longshoremen Act, which defines an employee as a maritime worker and then defines that as exceptions and so forth, and this has a couple more? That's who the employee is, is that right? Well, under this statute, no, B-2, as Justice Sotomayor referenced, it is an employer, some of whose employees are engaged in, quote, such operations. And Mr. Vidalede was exactly the kind of person who was engaged in such operations. So our submission, Justice Breyer, is that that is the kind of person that Congress contemplated when it was focusing on the workforce that would be engaged in the development of the Outer Continental Shelf. Well, but you — I don't mean to get back to it all the time, but it's not — you have to say that Congress contemplated the person who spent 30 percent of his time on the Outer Continental Shelf. In terms of us coming up with the test, maybe your client, it's an easy case where it's 98 percent, but the test you want us to adopt covers the person who spent 70 percent of his time on land. Mr. Chief Justice, if I could put it this way, the pushback for the but-for test in its broadest sense is that there isn't a natural kind of way of confining some restriction to it. And so if you look at the statute in terms of what it naturally must have meant by Congress, there is a natural limit, and it is not just complete but-for causation, but there are an effort — there is an effort to try to restrict the scope of the compensation. Thank you. Roberts. Thank you, counsel. Mr. Clement, you have 4 minutes remaining. Clement. Thank you, Mr. Chief Justice. A few points in rebuttal. First of all, Justice Kennedy, you asked about deference, and I think before you give any deference to the government's position, you should look at the other government's position that the government took in its brief to this Court in Pickett against petroleum helicopters in 2002. They have a completely different position now, and they've never explained the difference other than to say what they thought was plausible then, they now find persuasive now. That's not enough for deference. And in that brief, they took a position very similar to ours. There has to be status plus citus, but a slightly different citus, but otherwise it's on all fours with our position. Second of all, the government comes up here and says that the longshore remedy is an outlier among workers' compensation remedies because it's the only one with a citus. Well, the problem with that is of all the workers' compensation provisions that Congress could have extended to the Outer Continental Shelf, it picked the Longshore Act with that citus requirement. And the government also says, well, you know, the reason that the Longshore Act had a citus requirement was because of Jensen, and this Court's decision in Jensen created a problem about whether State workers' comp law could go to the navigable waters. Well, that's the exact same backdrop against which Congress is passing OCSLA. It doesn't know that State workers' compensation law can go to the Outer Continental Shelf. Jensen's still good law. Jensen tells Congress that it can't extend, State can't extend their laws to the navigable waters. What makes it? Ginsburg. Why doesn't Congress know? Because I think States overwhelmingly would include Outer Continental Shelf workers in their compensation schemes. Oh, no, Justice Ginsburg. What States overwhelmingly did is say a worker could be covered in a different State, but covering them on the Outer Continental Shelf was not something that was well established, and indeed, Congress specifically heard testimony that questioned the ability of either States to get their workers' comp law there directly, and also heard that there might be constitutional problems because of the Knickerbocker Ice case of Congress extending the State law there. So that's why they settled on this remedy of taking this Longshore Act that solved the Jensen problem on the navigable waters and solved the same problem for the Outer Continental Shelf. It would make sense to use the Longshore Act because they wanted to have the same level of compensation. As other alternatives, like the Jones Act? No, no, no. They wanted the Oxlaw worker to have the same benefits as the Longshore worker. Sure, when they were on the shelf, but they were solving the exact same kind of jurisdictional problem they solved with the Longshore Act with the shelf, with the statute. Justice Sotomayor, I don't think you can read too much into B-2. All B-2 is doing is modifying the same definition for longshores. You're an employer if you employ a longshoreman or a longshore worker. So they're just updating this for purposes of extending a longshore remedy to the shelf. B-3 does the same thing, and it modifies the citus and creates a citus that makes sense for the shelf, the navigable waters, dry docks, the shelf, artificial islands, and everything attached thereto. Just that, Mr. Chief Justice, you talked about the imprecision of their test. It's worse than that. It's imprecision without any text. At least in the Jones Act, you have the semen and you have some other textual clues as to where you draw these limits. Here, there's nothing in this statute that in any way suggests a status-based test. So you would be completely unmoored, if you will. The last point I would make is this. The answer to the causation test is really the kind of the lie to the other side's position is what they say when they're dealing with somebody who's not a 98 percenter but is a 2 percenter. When that person goes out on the shelf, when are they covered? Well, when the injury is operating on the shelf, cause them a direct injury on the shelf. At that point, even the government resorts to a citus-based test. Well, here's the problem. That status-based test, it's in the Jones Act. It's not in OXLA. And even when you recognize that and you look at what's left of the case, what's left of the case is either our approach that essentially incorporates the Longshore Act through B-3 or a tight nexus test that would require a geographical focus and give force to the words conducted on the shelf. This person was injured by operations for the purpose of exploring the shelf at some level, but he sure wasn't injured by operations conducted on the shelf for those purposes. He was injured by operations on dry land, and under those circumstances, the remedy lies with the State workers' comp law, not with OXLA. Roberts. Thank you, counsel. The case is submitted.